# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAHMIR CRAIG | : CIVIL ACTION |
| v. | : |
| NELSON COLLINS, ANITA AMARO, MICHAEL JAY, JOSEPH RYAN, THE CITY OF CHESTER and THE COUNTY OF DELAWARE | : <br> : <br> : <br> : NO. 13-1873 |

## MEMORANDUM OPINION

Savage, J.                                                                                                September 17, 2013

In this civil rights action brought under 42 U.S.C. § 1983, the dispositive issue is whether the defendant police officers had probable cause to arrest and detain the plaintiff Tahmir Craig on murder charges that were dismissed six months later. We conclude that they did. Thus, because the defendants are not liable under § 1983 for false arrest, false imprisonment and malicious prosecution, they are entitled to judgment as a matter of law.

In his complaint, Craig named six defendants: Captain Anita Amaro and Detective Nelson Collins of the Chester City Police Department; Lieutenant Joseph Ryan and Detective Michael Jay of the Delaware County Criminal Investigation Division; the City of Chester; and Delaware County. Craig contends that Collins and Jay falsely arrested him for a murder he did not commit and failed to properly investigate the crime before arresting him. He alleges that the defendants detained him for over six months despite knowing that he did not commit the murder. His only claim against Amaro and Ryan is that they did not investigate information provided to a police officer regarding

another possible suspect.[1] Craig claims his unlawful arrest and detention were caused by the municipal defendants' failure to properly supervise, train and discipline their employees.

Collins and Jay assert they had probable cause to arrest Craig, thus relieving them of any liability. Amaro and Ryan contend that because they had no personal involvement in the arrest or decision to prosecute Craig, there can be no supervisory liability under § 1983. They also contend that they were not policymakers and cannot be held liable under the municipal liability theory. The municipal defendants argue that because Craig has not sufficiently alleged that they had a custom or policy concerning the officers' alleged conduct, Craig cannot maintain a *Monell* claim against them.

All defendants moved to dismiss the complaint. Because they raised factual issues that were not alleged in the complaint, we converted their motions to ones for summary judgment. The parties had an opportunity to engage in discovery and supplement the record.

In his four-page opposition to the defendants' motions for summary judgment, Craig does not dispute any of the facts asserted by the defendants. His sole argument is that while knowing that another suspect resembled the person in the video, the Criminal Investigative Division was "dragging their [sic] feet" in the investigation of Williams' death.[2] He also makes, for the first time, a vague assertion that the assigned

---

[1] Compl. ¶ 30.

[2] Pl.'s Resp. Mot. Summ. J. at 2.

Delaware County assistant district attorney withheld "potential exculpatory evidence" from Craig's attorney once he asked for information regarding another suspect.[3]

Whether Craig has any constitutional claim stands or falls on whether the police had probable cause to arrest him. If there was probable cause, as the defendants argue, there is no basis for Craig's constitutional claims and the defendants are entitled to judgment as a matter of law.

### Facts[4]

Devon Williams was murdered on May 28, 2012, in Chester, Pennsylvania.[5] After conducting an investigation, Collins and Jay applied for a warrant to arrest Craig, which was issued by a Pennsylvania Magisterial District Judge on June 2, 2012. Craig surrendered to police two days later.

According to Craig's complaint, William Casey, a Chester police officer dispatched to the scene of the crime shortly after the shooting, spoke to two witnesses.

---

[3] "When Kramer asked McDonnell [the ADA] for more particular information regarding the Stollens [another suspect] matter, she refused to give any more information regarding Stollens. Kramer believed that McDonnell was withholding potential exculpatory evidence from him." Resp. at 2. At oral argument on the defendants' motions for summary judgment, Craig's counsel argued that the ADA was in possession of "certain exculpatory evidence," specifically knowledge of another suspect who may have had a motive to kill the victim, which she chose to bury. Tr. 4:20-25; 8:15-9:9, Aug. 21, 2013. At the same time, he emphasized that the ADA is not a defendant and he was not making any claims against her. Tr. 41:13-14.

[4] Pursuant to our Order dated May 30, 2013, which converted the motions to dismiss to motions for summary judgment, defendants supplemented the record with additional documents. The additional documents included the following: CID and Chester City investigation reports, the warrant to search Craig's home along with an affidavit of probable cause, the warrant for Craig's arrest along with an affidavit of probable cause, statements by two individuals who identified Craig from the newspaper photo, statements by the victim's girlfriend and an alibi witness, photos from the photo array, a still shot from the video surveillance footage of a convenience store, two still shots from the video surveillance footage of the incident, Craig's signed statement refusing to answer any questions, event chronology sheet, preliminary hearing transcript, the letter and materials sent to the FBI, the FBI examination report and the state court docket sheet. The defendants have not contested the factual allegations as stated in the complaint. Likewise, Craig has not disputed the facts asserted in the additional documents submitted by the defendants. Hence, there is no genuine dispute as to any material fact.

[5] Chester City Defs.' Mem. Supp. Mot. Summ. J. at 3 ("Chester City Defs.' Mot.").

3

One witness observed the victim running toward the scene of the shooting. The other saw a black male, wearing a white T-shirt and khaki pants, running away from the scene. Casey was not given the height and weight of the fleeing man.

Collins and Jay, the detectives assigned to investigate the murder, retrieved a surveillance video of the shooting from a nearby store. According to the investigation report, undisputed by Craig, the video depicted a black male in a white T-shirt and tan shorts chasing and firing at the victim, and then running away from the scene.[6] Seeking the public's assistance in identifying the shooter, the detectives distributed a still photo from the video to all local newspapers and television stations, which published the photo. A few hours later, the detectives received information from an anonymous source that the subject in the photo was known as "Tahmir."[7] A records check produced the name and address of Tahmir Craig and two pieces of photographic identification of Craig. Comparing the photos of Craig to the still shot from the video footage, the detectives concluded that the person in the photos resembled the shooter in the video.

The day after the shooting, the detectives received a telephone call from Mahoummad Zeinulaeewyn,[8] the owner of a convenience store located across the street from Craig's home. He informed the officers that he believed the man in the newspaper photograph was Craig, a patron of his store.[9] A few hours later, the

---

[6] Del. Cnty. Defs.' Suppl. R. to Pending Mot. Dismiss Ex. A, at 4 ("Defs.' Suppl. R."); Compl. ¶¶ 13-16.

[7] Chester City Defs.' Mot. Ex. L, at 6; Defs.' Suppl. R. Ex. B, at 6.

[8] The defendants' briefs refer to Zeinulaeewyn as Mr. Mohammed.

[9] Defs.' Suppl. R. Ex. G, Prelim. Hr'g Tr. 53:19-23, Aug. 3, 2012.

detectives received a call from Lee Jackson informing them that he believed that the person in the circulated photo was Craig, whom he had known for over twenty years.[10] Both Zeinulaeewyn and Jackson provided Craig's home address, which matched the one retrieved from the records check.

Acting on this information, Collins and Jay went to Craig's address. After no one answered there, they met with Zeinulaeewyn, who told them that Craig had been in his store prior to their arrival, walked into his house, and had not been seen leaving.[11] Zeinulaeewyn also reported that Craig's mother and stepfather had been in his store earlier that morning, reading the newspaper with the circulated photo. Craig's mother said that she needed a lawyer for her son.[12] She asked Zeinulaeewyn if he had any footage of Craig in the store on the day of the shooting to support a potential alibi.[13]

Zeinulaeewyn gave Collins and Jay video surveillance footage of his store from the day of the shooting depicting a man wearing a white T-shirt and tan short pants. Comparing the two videos, the detectives concluded that the subject in both videos was wearing the same clothes and matched Craig's description. They did not ask Zeinulaeewyn or anyone else to describe Craig's height and build.[14]

On May 30, 2012, Collins and Jay applied for a search warrant. Based upon the affidavit of probable cause, the warrant was approved by Magisterial District Judge

---

[10] Chester City Defs.' Mot. Ex. L, at 6.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Compl. ¶ 23.

Davis.[15] The affidavit included the information from Zeinulaeewyn and Jackson that the fleeing man in the photo was Craig and that the person in the footage at Zeinulaeewyn's store was wearing the same clothes as the man in the footage of the incident. Pursuant to the warrant, the detectives searched Craig's house the same day. They seized nothing.

That same day, Collins and Jay interviewed Kerie Hahn, the victim's girlfriend, who related that she had witnessed an altercation between the victim and some men in a car a few days prior to the incident. From a photo array, she identified Craig as one of the persons in the car who exchanged confrontational words with the victim.

On May 31, 2012, Zeinulaeewyn and Jackson confirmed that Craig was the person in the circulated photograph. They provided written statements to the detectives. Each picked Craig out of a photo array.

Three days after the shooting, an unidentified individual stopped Chester Police Officer Mark Barag, claiming he had information regarding the shooting. By his account, the victim had been feuding with a drug dealer called "Diddy" whom the victim had chased with a gun the day before the murder.[16] According to this individual, Diddy retaliated against the victim by getting another drug dealer associate from Delaware to shoot him.[17] The informant urged Barag to check the video surveillance on May 27, 2012, to verify the chase story. The informant did not profess to have witnessed the shooting. Nor did he identify the shooter.

---

[15] Chester City Defs.' Mot. Ex. M.

[16] Compl. ¶¶ 24-26.

[17] *Id.* ¶ 29.

According to the complaint and not denied by the defendants, Barag relayed the information to Collins, Jay, Amaro and Ryan. Craig claims they never pursued this information.[18] However, according to the investigation report, the contents of which Craig has not disputed, the detectives unsuccessfully attempted to locate Diddy, Diddy's girlfriend and her brother.[19] Because we view the facts in favor of Craig, we shall assume that the detectives did not pursue the lead.

On June 2, 2012, Collins and Jay applied for a warrant for Craig's arrest. The supporting affidavit of probable cause, signed by both detectives, stated that the subject in the footage from Zeinulaeewyn's store was wearing the same clothing as the shooter captured in the footage of the incident. It also summarized the interviews of Zeinulaeewyn and Jackson, who identified the subject in the circulated photograph as Craig and picked him out of a photo array. The complaint was approved by a deputy district attorney. Based upon the probable cause affidavit, Magisterial District Judge Seaton issued an arrest warrant.[20]

On June 4, 2012, Craig surrendered to the police and was charged with first and third degree murder, aggravated assault, reckless endangerment, possession of an instrument of crime, and carrying a firearm without a license.[21] He was held without bail in Delaware County Prison.

---

[18] *Id.* ¶ 30.

[19] Defs.' Suppl. R. Ex. A at 4.

[20] Defs.' Suppl. R. Ex. B.

[21] Defs.' Suppl. R. Ex. K.

On August 3, 2012, a preliminary hearing was held before Magisterial District Judge Davis.[22] The Commonwealth called Officer Casey, Jackson and Zeinulaeewyn. It also introduced eight exhibits, including the footage of the incident, the circulated newspaper photo, the photo array signed by Zeinulaeewyn and Jackson, and Craig's Facebook photograph. The video of the incident was played as part of the Commonwealth's case. Finding that the Commonwealth had established a *prima facie* case on all charges, Judge Davis bound the case over for trial.[23]

The detectives continued their investigation into 2013. On January 30, 2013, Jay requested assistance in conducting facial recognition, and forensic and photogrammetric analyses from the Pennsylvania State Police and the Federal Bureau of Investigation.[24] On March 12, 2013, Craig submitted to a height measurement, which determined that he was 5'5½" tall. In a report dated March 15, 2013 and sent on March 19, 2013, the FBI opined that the individual depicted in the footage of the incident was approximately 5'11½" – six inches taller than Craig. The report noted differences between the individual in the incident footage and Craig's photographs. At the same time, it cautioned that Craig "could not be eliminated as being the questioned individual based on the facial comparison."[25]

---

[22] Defs.' Suppl. R. Ex. G.

[23] Defs.' Suppl. R. Ex. G at 71.

[24] Defs.' Suppl. R. Ex. H.

[25] Defs.' Suppl. R. Ex. J at 3.

On March 20, 2013, one day after receiving the FBI report, the Delaware County District Attorney's Office moved for a *nolle prosequi* of criminal charges against Craig, which was granted on the same day. Craig was released on March 21, 2013.[26]

**Legal Standard**

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and emphasis omitted). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

**Discussion**

Craig predicates his constitutional claim against the individual defendants on three theories: (1) false arrest; (2) false imprisonment; and (3) malicious prosecution. In

---

[26] Defs.' Suppl. R. Ex. K.

essence, he claims that the defendants lacked probable cause to arrest, detain and prosecute him.[27]

## False Arrest and False Imprisonment

False arrest and false imprisonment causes of action are intertwined. A false arrest claim is "grounded in the Fourth Amendment's guarantee against unreasonable seizures." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). A false imprisonment cause of action derives from the Fourteenth Amendment bar against a deprivation of liberty without due process of law. *Baker v. McCollan*, 443 U.S. 137, 142 (1979). False imprisonment is the detention of one without legal process. *Wallace v. Kato*, 549 U.S. 384, 389 (2007). An arrest lacking probable cause provides a claim under § 1983 for false imprisonment based on the detention arising out of that false or illegal arrest, implicating the Fourth Amendment guarantee against unreasonable seizures. *Groman*, 47 F.3d at 636. Thus, both claims rest on a lack of probable cause for the arrest.

To establish a Fourth Amendment claim for false arrest and false imprisonment, Craig must prove that Collins and Jay lacked probable cause to arrest him. *Groman*, 47 F.3d at 636; *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988). The issue is not his innocence or guilt.[28] Rather, it is whether there was probable cause to arrest

---

[27] In paragraphs 41 and 42 of the Complaint, Craig asserts that the arrest and detention were "carried out unlawfully, intentionally and maliciously, without just or probable cause." He has proffered no evidence to support this conclusory statement.

[28] As the Supreme Court has stated, "the Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). In *Hill v. California*, 401 U.S. 797 (1971), the Supreme Court considered whether the mistaken arrest of one person (for whom no probable cause to arrest existed) based upon the misidentification of that person as a second person (for whom probable cause to arrest existed) violated the Constitution. The Court concluded it did not, writing that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the

him. *See Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005); *Dowling*, 855 F.2d at 141 ("The proper inquiry in a section 1983 claim based on false arrest or misuse of the criminal process is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."). In sum, there can be no claim for false arrest or false imprisonment where the arrest was based on probable cause. *Groman*, 47 F.3d at 636 (citing *Baker*, 443 U.S. at 143-44).

Here, Collins and Jay did not make the call on probable cause. They left that determination to a detached issuing judicial authority. They presented the facts garnered from their investigation to the magisterial judge who decided there was probable cause to arrest Craig.

Reliance on an arrest warrant does not always provide a shield against a false arrest claim. *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). Where the warrant was issued on the basis of an affidavit that knowingly and deliberately, or with a reckless disregard for the truth, contained material false statements or omitted material facts necessary to the probable cause determination, it may not justify an arrest and is deemed inadequate. *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (citing *Wilson*, 212 F.3d at 786-87) (internal quotations omitted); *see also Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). If after deleting the false statements and adding the omitted material facts there is no probable cause, the warrant is deemed illegal and

---

first party, then the arrest of the second party is a valid arrest." *Id.* at 802; *see also Johnson v. Miller*, 680 F.2d 39, 42 (7th Cir. 1982) (police officers' mistaken arrests of a white woman pursuant to an arrest warrant for an African American woman did not violate the Constitution).

invalid. *Franks*, 438 U.S. at 156. In that case, the officer is vulnerable to a false arrest claim.

Absent false statements or material omissions in the affidavit of probable cause, there is no basis for causes of action for false arrest and false imprisonment predicated on lack of probable cause. Craig has made no argument nor presented any evidence that the police falsified any information or omitted material information that created a falsehood in the affidavit.[29] Instead, he attacks the thoroughness and efficiency of the police investigation. His attack is not premised on a constitutional violation, but rather on negligence.[30]

---

[29] At oral argument, Craig's counsel argued that the affidavit was misleading in describing how the identification of Craig from the newspaper photograph actually occurred. Tr. 40:4-6, Aug. 21, 2013 (Q: "There are no false statements; correct? A: "Well, only potentially the misleading statement of how Mr. Craig was identified.") He stated that the newspaper printed two photos on the front page, one from the surveillance footage of the incident and the other of Craig's actual photo identification. Tr. 30:10-23; 33:11-34:3.

In a declaration filed later on the day of oral argument, counsel admitted he had been mistaken. Aff. (Doc. No. 17) The front page of the newspaper depicted one photograph of the person captured in the video surveillance. In other words, the only "misleading" piece of information counsel contested in the affidavit of probable cause was not misleading or false.

[30] Negligence "is not actionable as a due process deprivation of a civil right." *Wilson*, 212 F.3d at 789 n.5 (citation omitted); *see also Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007) (plaintiff "must show that [defendant's] failure to investigate was intentional or reckless, thereby shocking the conscience" because negligently failing to investigate further does not violate due process); *Wilson v. Lawrence Cnty., Mo.*, 260 F.3d 946, 955 (8th Cir. 2001) ("[O]nly reckless or intentional failure to investigate other leads offends a defendant's due process rights," however, a negligent failure to investigate does not violate due process); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (distinguishing between police officer's negligent failure to follow up on exonerative leads with situation where police officer "knowingly and willfully ignored substantial exculpatory evidence . . . [and] deliberately looked the other way in the face of exonerative evidence indicating he arrested the wrong man"); *cf. Russo v. City of Bridgeport*, 479 F.3d 196, 210, 212 (2d Cir. 2007) (denying qualified immunity on motion for summary judgment because defendant police officers "acted intentionally in hiding exculpatory evidence," which coupled with other evidence demonstrated an "intentional violation of, or deliberate indifference to, [the plaintiff]'s constitutional rights"). Indeed, even allegations of gross negligence do not state a due process violation. *Clemmons v. Armontrout*, 477 F.3d 962, 966 (8th Cir. 2007).

Here, there is no evidence that the detectives' acts—or their failure to act—rose to the level of either intentional or reckless conduct, nor did they shock the conscience.

Craig does not dispute any of the facts recited in the affidavit supporting the arrest warrant.[31] He does not challenge the arrest warrant, either in his complaint or in his opposition brief. Instead, his complaint reiterates and relies upon the facts recited in the affidavit of probable cause. He makes no claim and has presented no evidence that the warrant was facially invalid or that the affidavit does not make out probable cause.

Typically, the question of whether the police had probable cause is one of fact for the jury. *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)); *Groman*, 47 F.3d at 635. However, we may conclude that probable cause existed as a matter of law if the evidence, viewed in favor of the non-moving party, "reasonably would not support a contrary factual finding." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788-89 (3d Cir. 2000). In other words, if a reasonable jury could not conclude that there was a lack of probable cause, the defendants are entitled to summary judgment.

The identification of an individual as the perpetrator of a crime by a comparison of photographs may establish probable cause for an arrest. *United States v. Scheets*, 188 F.3d 829, 837-38 (7th Cir. 1999) (finding probable cause to arrest where police

---

[31] At oral argument, Craig's counsel asserted that he is not disputing the contents of the affidavit that was attached to the application for an arrest warrant. Tr. 3:16-19, Aug. 21, 2013. Mr. Oxman stated as follows:
    A. Well, I'm not disputing what the officers said. If we're talking truly about the Fourth Amendment issues in terms of unlawful arrest and detention, obviously since the arrest of Mr. Craig was issued by a warrant from a magistrate, those issues are off the table. I think that the only issue regarding this case surviving is the issue of malicious prosecution, which is a separate issue apart from the unlawful arrest and detention.
    . . .
    Q: You're saying that because there was an arrest warrant issued on the basis of probable cause that there is really no claim for false arrest nor a claim for false imprisonment, however, there remains a malicious prosecution claim. Is that what you're saying?
    A. Yes.
Tr. 4:1-17.

officers compared a photograph of the perpetrator at the crime scene produced by a surveillance camera with a photograph of the arrestee and the arrestee himself); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991) ("When an officer has 'received his information from some person . . . who it seems reasonable to believe is telling the truth,' he has probable cause")(citations omitted); *Mears v. McCulley*, 881 F. Supp. 2d 1305, 1321 (N.D. Ala. 2012) (finding probable cause to arrest where plaintiff was mistakenly arrested after being identified by his uncle and aunt).

In this case, two persons identified Craig as the shooter depicted in the photographs distributed in the local media.[32] The witnesses were not anonymous and both knew Craig. Zeinulaeewyn had seen Craig as a customer three to four times a day for two years.[33] Jackson had known Craig for more than twenty years and knew where he lived. Both provided statements and picked Craig out of a photo array as the person in the video.

Collins and Jay also reviewed the footage provided by the store owner. After comparing it to the video surveillance of the day of the shooting, they believed that the person in both videos was Craig. From these facts, a reasonable officer could conclude that there was sufficient information that Craig was the shooter, leading the officers to apply for an arrest warrant.

Collins and Jay presented the facts they developed in their investigation to the District Attorney's Office. After reviewing the criminal complaint and the affidavit, the

---

[32] Compl. ¶ 19.

[33] Prelim. Hr'g Tr. 49:1-11.

prosecutor authorized the application for an arrest warrant. A neutral magistrate then determined there was probable cause to arrest Craig.

Rather than attacking the arrest warrant, Craig faults the investigation. He contends that the detectives "failed to take basic required investigative steps in connection with establishing probable cause" and "failed to reasonably interview witnesses readily available, investigate basic evidence, or otherwise inquire if the plaintiff committed the crimes he was charged with before invoking the power of arrest and detention."[34] A failure to consider reasonably discoverable exculpatory evidence may constitute a constitutionally deficient investigation. In other words, a plaintiff can prevail on a false arrest and false imprisonment claim by showing that the arresting officer ignored exculpatory evidence. *See Wilson*, 212 F.3d at 790 (holding a police officer cannot simply ignore or omit exculpatory evidence in an affidavit of probable cause supporting arrest); *Kingsland v. City of Miami*, 382 F.3d 1220, 1228-29 (11th Cir. 2004) (holding that an officer may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts"); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). On the other hand, a plaintiff cannot succeed by merely showing that the police could have done a better job of investigating or failed to exhaust all leads after they had enough information to establish probable cause.

"[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *Kingsland*, 382 F.3d at 1229 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)), and has "no general duty to investigate further after acquiring information sufficient to establish

---

[34] Compl. ¶¶ 47-48.

probable cause." *BeVier*, 806 F.2d at 127 n.1 (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432, 437-42 (7th Cir.1986)); *Patterson v. Sch. Dist. of Phila.*, No. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. July 19, 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence."); *Porter v. Gray*, No. 05-CV-231, 2007 WL 464694, at *12 (W.D. Pa. Feb. 13, 2007) (although police officer could have performed "a more thorough investigation" of allegedly exculpatory evidence, including contacting a person with knowledge of the events, "these arguable deficiencies do not rise to the level of a constitutional violation"); *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("[T]he issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").

Here, Craig alleges that the officers failed to ask witnesses about the shooter's height and build, and to investigate the information provided to Barag regarding Diddy's retaliatory motives. The unidentified informant did not claim that he had seen the shooting or knew who did it.

Having the positive identifications from two witnesses, the video footage, the victim's girlfriend's account of the recent altercation between the victim and Craig, the detectives were not required to investigate further before presenting these facts to the District Attorney for approval of an application for an arrest warrant and to a magistrate judge to make a probable cause determination. Significantly, the magisterial district

16

judge had the opportunity to visually compare the person in the video footage of the shooting with Craig who was sitting before him.

In his opposition, Craig contends, without providing any evidentiary basis, that the assistant district attorney withheld detailed information about another suspect from Craig's criminal defense attorney. According to Craig, that information was "potential exculpatory evidence" and should have been provided. The assistant district attorney is not a defendant in this case. Nor is there any claim that she acted in concert with any of the defendants prior to his arrest and detention.

## Malicious Prosecution[35]

To succeed on his malicious prosecution claim, Craig must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing him to justice; and (5) he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *See Donahue v. Gavin*, 280 F.3d 371, 379-80 (3d Cir. 2002).

Initiation of the proceeding without probable cause is an essential element of a malicious prosecution claim. *Marasco*, 318 F.3d at 521-22. Because there was probable cause to arrest him, Craig cannot prevail on his malicious prosecution claim.

---

[35] To the extent Craig asserts a malicious prosecution claim under Pennsylvania law, a finding of probable cause defeats the state claim. Under the Tort Claims Act, a municipal employee may be held liable only when his or her conduct constitutes a "crime, actual fraud, actual malice, or willful misconduct." 42 Pa. C.S.A. § 8550. "Willful misconduct" means the state actor understood the actions he took were illegal, yet chose to take them anyway. *See Johnson v. Sch. Dist. of Phila.*, No. 06-CV-4826, 2008 WL 3927381, at *10 (E.D. Pa. Aug. 21, 2008). Conduct is "willful" when the state actor "intend[s] to bring about the result that followed, or at least [was] aware that it was substantially certain to follow, such that intent may be implied." *Id.* (citing *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 287 (3d Cir. 2006)).

Craig does not allege that the detectives engaged in willful misconduct. At most, he asserts sloppy and negligent conduct in conducting an investigation.

Based upon this undisputed evidence, viewed in Craig's favor, a reasonable jury could not find that the defendants did not have probable cause to arrest and detain Craig. Therefore, the defendants are entitled to judgment as a matter of law.

## Qualified Immunity

Collins and Jay are also entitled to qualified immunity. Based on the information they possessed at the time of the arrest, it was reasonable for them to mistake the existence of probable cause. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . should not be personally liable."); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (immunity should be recognized where officers of reasonable competence could disagree on whether there was probable cause to support a warrant).

Collins and Jay relied on an arrest warrant issued by a neutral magistrate. Whether a police officer who applied for an arrest warrant is protected by qualified immunity from liability under § 1983 depends upon whether "the warrant application is so lacking in indicia of probable cause as to render [the] offic[ers'] belief in its existence unreasonable[.]" *Malley*, 475 U.S. at 344-45; *see also Orsatti*, 71 F.3d at 483 (citing *Malley* and stating that a police officer is entitled to qualified immunity where grounds for probable cause stated in warrant application were objectively reasonable). The standard in determining the reasonableness of the officers' belief in the existence of probable cause is "whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied

for the warrant under the conditions." *Orsatti*, 71 F.3d at 483 (citing *Malley*, 475 U.S. at 345).

We cannot conclude that a reasonable officer would have known that his affidavit failed to establish probable cause based on the information Collins and Jay possessed at the time they applied for the arrest warrant. Two persons identified the photograph of the shooter distributed in the local media. Jackson stated that he knew Craig for more than twenty years and knew where he lived. The store owner had seen Craig in his store three to four times a week for the past two years. As Craig himself alleges, Collins and Jay reviewed the footage provided by the store owner and compared it to the video surveillance obtained on the day of the shooting. They believed that the subject in both videos matched Craig's description. They also believed the individual in the shooting video was wearing similar clothes to the individual in the store video. Because the detectives believed they had probable cause for an arrest and they did not misrepresent or omit material facts in their affidavit, they were entitled to rely on a neutral magistrate's independent determination of probable cause. Accordingly, they are protected by qualified immunity.

## Conclusion

Viewing the evidence in the light most favorable to Craig and drawing all inferences in his favor, we conclude that the undisputed material facts could not lead a reasonable jury to find a lack of probable cause. On the contrary, the uncontradicted evidence establishes probable cause to arrest Craig.

A finding of probable cause is fatal to all of Craig's federal claims. He has produced no evidence showing that the arrest warrant was issued without probable

cause. His complaints about the thoroughness of the police investigation do not rise to the level of a constitutional violation. Absent a constitutional violation, there can be no municipal liability.[36] Furthermore, Craig produced no evidence to support his conclusory claim of *Monell* liability. Therefore, all defendants are entitled to summary judgment as a matter of law.

---

[36] *See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 121 (1992) ("[F]or there to be municipal liability, there still must be a violation of plaintiff's constitutional rights.")).